IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RONALD E. HUFFMAN, Trustee of the | ) | |
| Ronald E. Huffman Revocable Living Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No.  07-CV-702-TCK-PJC |
| | ) | |
| | ) | |
| LEE COHEN, an individual; | ) | |
| GORDONA DUCA, INC., an Oklahoma | ) | |
| Corporation; | ) | |
| COLDWELL BANKER RADERGROUP, | ) | |
| an Oklahoma corporation; | ) | |
| SITTON PROPERTIES, LLC, a Missouri | ) | |
| Limited Liability Company, | ) | |
| MIKE SITTON, an individual, | ) | |
| WILLIAM F. RICHERT, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are Defendant Lee Cohen's Motion for Summary Judgment (Doc. 47);

Defendant Gordona Duca, Inc.'s Motion for Summary Judgment (Doc. 50); and Defendants Mike

Sitton, Sitton Properties, LLC, and William F. Richert's Motion for Summary Judgment (Doc. 48).

## I.    Factual Background

Plaintiff Ronald Huffman ("Huffman"), an Arizona resident, is trained as a dental lab

technician and is the owner of several companies that fabricate dental prosthetic appliances.  Over

time, Huffman acquired property surrounding the home of his mother-in-law in Sapulpa, Oklahoma,

until he eventually owned a tract of land in Sapulpa totaling sixty acres ("Sapulpa Tract").  At all

relevant times, Huffman resided in Arizona.

On April 8, 2002, Huffman entered into a listing agreement with Defendant Gordona Duca

Realtors, Inc. ("Gordona Duca") and a Gordona Duca sales associate, Lee Cohen ("Cohen"),

whereby Huffman gave Gordona Duca/Cohen exclusive rights to sell the Sapulpa Tract at a listing price of $1,100,000 from April 8, 2002 until October 7, 2002 ("4/8/02 Listing Agreement").[1] Cohen executed the 4/8/02 Listing Agreement on behalf of Gordona Duca and was the sales associate with whom Huffman dealt at all relevant times.  Paragraph 11 of the 4/8/02 Listing Agreement provides that the term "REALTOR," as used in the agreement, "shall include any sales associate of REALTOR whose signature appears on this Agreement."  (*See* 4/8/02 Listing Agreement ¶ 11, Ex D. to Cohen's Mot. for Summ. J.)  Thus, Gordona Duca and Cohen are both "REALTORS," as that term is used in the 4/8/02 Listing Agreement.  The 4/08/02 Listing Agreement further specifies that "REALTOR," *i.e.*, Gordona Duca and Cohen, shall provide "Transaction Broker Services" to Huffman.[2]

A.   Preliminary Negotiations

As early as June 20, 2001, Defendant Mike Sitton ("Sitton"), by and through his agents, communicated with Cohen regarding the Sapulpa Tract.  (*See* 6/20/01 Fax from Cohen to Sitton's agent regarding possible exchange of Sapulpa Tract for tracts of land containing hotel and restaurant, Ex. E to Cohen's Mot. for Summ. J., at Bates Stamp Cohen 641.)  On March 19, 2002, Cohen sent a fax to Huffman requesting that Huffman initial a document entitled "Sitton Land for Huffman Land," which described the "Sitton Land" as a twenty-two acre tract and set forth terms of a possible property exchange.  (*See* 3/19/02 Fax from Cohen to Huffman, Ex. E to Cohen's Mot. for Summ. J., at Bates Stamp Cohen 503-04.)  On May 28, 2002, Cohen sent a letter to Defendant

---

[1]      The parties also entered into two prior listing agreements that are not at issue.

[2]      As explained *infra* Part V.A, a "transaction broker" is a statutorily defined term under Oklahoma law.

William Richert ("Richert"), Sitton's broker, proposing that if Sitton would provide a $400,000

deposit, Huffman would entertain taking back a purchase money mortgage.  (5/28/02 Letter, Ex. E

to Cohen's Mot. for Summ. J., at Bates Stamp Cohen 191.)  These negotiations did not result in any

agreement.

      B.     Negotiations Leading to Exchange Agreement

     On June 10, 2002, Cohen sent Richert a letter stating:

> Over the weekend, I have spoken with Mr. Huffman regarding the exchange of
> properties.  Mr. Huffman has agreed to the following with Mr. Sitton:
> 1.  Mr. Sitton will offer approximately $300,000 in cash at closing.
> 2.  Mr. Sitton will offer approximately 7.5 acres + to Mr. Huffman.  The property
> being offered is outlined in the enclosed property survey.
> 3.  Mr. Sitton will offer an additional real estate *which has a proven value of*
> *$200,000.00 or more* to make up the difference in the sale of the Sapulpa property.
> In consideration for the above Mr. Huffman will:
> 1.  Transfer the Sapulpa property to Mr. Sitton at the time of closing.
> 2.  The sale price will be reduced from $1,100,000 to $1,000,000.
> Please feel free to call with any questions.

(6/10/02 Letter, Ex. E to Cohen's Mot. for Summ. J., at Bates Stamp Cohen 467 (emphasis added).)

On June 12, 2002, Sitton personally responded to Cohen's letter:

> We are in receipt of your June 10 letter to Bill Richert regarding [the Sapulpa Tract].
> We would be willing to accept transfer of the [Sapulpa Tract] valued at $1,000,000
> for the following:
> 1.  $250,000 cash at closing.
> 2.  The approximately 7.5 acres located at West 51st and the Gilcrease Expressway.
> 3.  An approximate 10 acre tract of land in Grove, Oklahoma which fronts Highway
> 10 and is across from the new High School and theatre.
> If you have any questions or would like to discuss this matter, please give me a call
> at 492-1900.

(6/12/02 Letter, Ex. E. to Cohen's Mot. for Summ. J., at Bates Stamp Cohen 466.)  On Thursday,

June 20, 2002, Huffman sent Sitton a Letter of Intent consistent with Sitton's proposal in the 6/12/02

Letter ("Letter of Intent").  Specifically, it provided that the Sapulpa Tract would be exchanged for

Sitton's 7.5 acre tract ("Tulsa Tract"), Sitton's 10 acre tract ("Grove Tract"), and $250,000 cash.

Sitton and Huffman executed the Letter of Intent on June 21, 2002.  The Letter of Intent was drafted

by Cohen.

On June 25, 2002, Huffman's personal attorney Paul Burgess ("Burgess"), drafted a one-page

document entitled "Review of Letter of Intent" ("Burgess Review"), which, according to Burgess,

was drafted for the purpose of assessing tax consequences of the property exchange.  Relevant to this

case, the Burgess Review states:

> 4.  Allocation of Sales/Purchase Price
>     a.   Allocate as much of the $250,000 cash less selling cost to personal property.  The personal property falls outside Sec. 1031 b/c [Huffman] not receiving any personal property in exchange.
>         i.  What is the fair value of personal property
>             1.  It has zero basis.
>             2.  Can it support of $200,000 valuation?
>                 a.  Does not look like it.
>     b.  *What is fair value of the Grove property?*
>         i.  Is there a sell timeframe?
>         ii.  What is the intended use
>     c.  *What is the fair value of the West Tulsa property*
>         i.  Is there a sell timeframe?
>         ii.  What is the intended use?
> . . .
> 6.  *Lee, consider myself or Ken Bodenhammer, Ron's other lawyer who handles many of his local real estate dealing.*

(Ex. Q to Cohen's Mot. for Summ. J (emphasis added).)  Cohen recommended that Huffman use an

attorney named Rick Riddle ("Riddle"), rather than Burgess or Ken Bodenhammer, to draft the final

agreement that would govern the exchange of property.  Upon Cohen's advice, Huffman ultimately

hired Riddle to draft the agreement.

C.      Exchange Agreement

By July 12, 2002, Sitton and Huffman had both executed a document drafted by Riddle entitled "Agreement for the Exchange of Real Estate" ("Exchange Agreement"), which was the final agreement governing the exchange of property between Sitton and Huffman.  (Ex. I to Cohen's Mot. for Summ. J.)[3]  According to Huffman, he agreed to the Exchange Agreement based on his belief that Cohen would not have recommended the Exchange Agreement or drafted the Letter of Intent if the values set forth therein were not reasonable fair market values for the Tulsa Tract and Grove Tract. When Huffman expressed concerns to Cohen about paying him a double commission, once for the Exchange Agreement and then again for sale of the Tulsa Tract and Grove Tract, Cohen told Huffman that such commissions would be covered by the sales prices of the Tulsa Tract and Grove Tract.

Several provisions of the Exchange Agreement are relevant to the parties' summary judgment arguments.  The Exchange Agreement contains a paragraph entitled "The Property Valuations and Balancing of Equities," which provides:

> *The parties agree that the fair market value* (as that term is defined in the Code and the Treasury Regulations thereunder) of the Exchange Properties, and respective equity of the Parties in their respective properties are as follows:

---

[3]      The Exchange Agreement qualified for the provisions of Section 1031 of the Internal Revenue Code, which generally allows parties to defer certain tax consequences of their transaction.  Thus, the parties sometimes referred to the Exchange Agreement as the 1031 agreement.

(a) Huffman:
    (1) The Huffman Property:[4]    Eight Hundred Fifty Thousand Dollars ($850,000.00) with Huffman's equity equal to the same amount.
                                           <u>Total Fair Market Value and Equity:</u> $850,000.00

(b) Sitton
    (1) The Sitton 7.5:[5]    Five Hundred Thousand and No/100 Dollars ($500,000.00), with an equity equal to the same amount; and
    (2) The Sitton 10:[6]    Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), with an equity equal to the same amount.
    (3) Boot:[7]    One Hundred Thousand and No/100 Dollars ($100,000.00)
                                           <u>Total Fair Market Value and Equity:</u> $850,000.00

(Exchange Agreement ¶ 6 (footnotes and emphasis added).) The Exchange Agreement also provided that Sitton would purchase certain equipment located on the Sapulpa Tract for a purchase price of $150,000 ("Equipment Purchase"). The Equipment Purchase is described in the Exchange Agreement as a "separate transaction from the Exchange" that was to close simultaneously with the property exchange. Thus, Sitton "paid" $850,000 in property and cash for the Sapulpa Tract and paid an additional $150,000 for the equipment, for a total of $1,000,000.

Paragraph 17 of the Exchange Agreement is entitled "Broker Relationship Disclosure/Commission" and provides:

---

[4]    The Huffman Property is the Sapulpa Tract.

[5]    The Sitton 7.5 is the Tulsa Tract.

[6]    The Sitton 10 is the Grove Tract.

[7]    "Boot" is defined as "the payment of additional cash consideration." (Exchange Agreement ¶ 2.)

> The parties to this transaction hereby acknowledge that, prior to the parties entering into this Agreement, the following disclosures were clearly made to each of the parties pursuant to the Oklahoma Broker Relationship Act (the "Act").
> Bill Richert is acting as a Transaction Broker (as defined by the Act) for Sitton. *Gordona Duca, Inc., and its agent, Lee Cohen, is acting as Transaction Broker for Huffman.*
> . . .
> It is further acknowledged and agreed by the parties that *Huffman will pay Gordona Duca, Inc.* a real estate commission in the amount that is provided in a separate commission agreement based on a property sales valuation of $1,000,000, which is the agreed value of the Huffman Property and Equipment.

(Exchange Agreement ¶ 17 (emphasis added).)  Thus, the Exchange Agreement states that Gordona Duca and Cohen served as a "transaction broker" for Huffman and that Gordona Duca was to receive the commission.

Paragraph 8.2 of the Exchange Agreement, entitled "PHYSICAL INSPECTION/DUE DILIGENCE PERIOD," provides:

> No representations, warranties, or guarantees regarding the condition of the Exchange Properties, or environmental hazards, expressed or implied, are made by the Conveying Party to the Acquiring Party, except as specifically described below. Within 20 days from the Effective Date (the "Inspection Period"), Conveying Party . . . shall have the right to enter upon the Acquiring Party's Exchange Properties for the purpose of making such non-intrusive inspections as the Acquiring Party may deem appropriate . . . .

(*Id.* ¶ 8.2.)  On July 21, 2002, Cohen sent a letter to Huffman regarding the Exchange Agreement ("7/21/02 Letter"), reminding Huffman of this physical inspection period:

> The contract allows you a twenty (20) day Inspection/Due Diligence Period from the effective date to review and inspect the subject property . . . . The Inspection/Due Diligence Period will expire on the <u>15th of August at twelve midnight</u>.  When you and I spoke last night you had indicated that you will not be visiting the subject properties during the 20 days.  Considering this, I would appreciate it if you would acknowledge your waiver of visiting the properties by initialing the bottom of this letter.

(Ex. L to Cohen's Mot. for Summ. J.)  Huffman, who lived in Arizona, did not physically inspect the properties and initialed the letter.  Nor did Huffman request that Cohen arrange for an appraisal of the properties.  The Exchange Agreement closed on September 23, 2002.

      D.      Subsequent Listing of the Sapulpa Tract, Tulsa Tract, and Grove Tract

On October 1, 2002, approximately two weeks following closing of the Exchange Agreement, Sitton entered into a Listing Agreement with Gordona Duca/Cohen for the sale of the Sapulpa Tract in the amount of $1,100,000.  This agreement was executed on behalf of Gordona Duca by Cohen.  Thus, following the Exchange Agreement, Gordona Duca/Cohen became Sitton's broker for purposes of selling the Sapulpa Tract, giving Cohen another opportunity to earn a commission on the Sapulpa Tract.

Sometime prior to December 1, 2003, Cohen became a sales associate with McGraw Davisson Stewart Realtors ("McGraw").  On December 1, 2003, Huffman and McGraw/Cohen entered into a Listing Agreement for sale of the Tulsa Tract in the amount of $525,000 ("12/1/03 Listing Agreement"), which expired May 31, 2004.  On December 9, 2003, Huffman and McGraw/Cohen entered into a Listing Agreement for the sale of the Grove Tract in the amount of $325,000 ("12/9/03 Listing Agreement"), which expired June 8, 2004.[8]  Subsequent listing agreements for the Tulsa Tract and Grove Tract are not part of the record, and it is not clear how

---

[8]      The 12/1/03 and 12/9/03 Listing Agreements name Cohen as the executing party on behalf of McGraw, although the copies in the record are not executed.

long Cohen continued to list these properties for Huffman.[9]  During the time Cohen listed the Tulsa Tract and Grove Tract for Huffman, Cohen never brought Huffman an offer on either property.

In March 2007, Huffman fired Cohen and retained another realtor, Marco Placencia ("Placencia"), to sell the Tulsa Tract and Grove Tract.  According to Huffman, Placencia advised him that he thought the properties were overpriced.  At that point, Huffman called Burgess and asked him to determine the approximate worth of the properties.  Within one or two days, Burgess gave  Huffman his opinion that the properties were overvalued at the time of the Exchange Agreement by approximately two-thirds.  Burgess further informed Huffman that (1) Sitton purchased the Tulsa Tract on November 13, 2001, approximately eight months prior to the Exchange Agreement, for $175,000, and (2) Sitton purchased the Grove Tract on June 9, 2000, approximately two years prior to the Exchange Agreement, for $109,000.  At that time, Huffman formed the belief that Cohen, Sitton, and Richert perpetrated a fraud upon him by misrepresenting the values of the Tulsa Tract and Grove Tract as $500,000 and $250,000, respectively.

E.      Huffman Files Suit

On June 20, 2007, Huffman filed a Petition in the District Court for Tulsa County ("Petition").  Huffman asserted claims against Cohen, Gordona Duca, and Gordona Duca's successor-in-interest, Coldwell Banker Group ("CBG"), for breach of contract, negligence, fraud, breach of statutory duty, and breach of fiduciary duty.  Huffman also asserted a claim for fraud against Sitton, Sitton Properties, and Richert (collectively "Sitton Defendants").  Huffman alleges:

---

[9]      Huffman's "Additional Statement of Facts" provides that Huffman listed these properties with Cohen until March 2005.  (*See* Resp. to Cohen's Mot. for Summ. J., "Additional Statement of Facts," ¶¶ 1-2.)  However, this assertion is not supported by the attached listing agreements or the cited deposition testimony.

(1) Cohen and Gordona Duca breached the 4/8/02 Listing Agreement by failing to comply with the duties set forth therein; (2) Cohen and Gordona Duca breached statutory duties imposed upon real estate brokers; (3) Cohen and Gordona Duca breached common-law fiduciary duties to Huffman; (4) Cohen was negligent in obtaining information and making representations concerning the value and marketability of the Tulsa Tract and Grove Tract; (5) Cohen committed fraud by making representations concerning the value and marketability of the Tulsa Tract and Grove Tract with knowledge that such representations were false or with reckless disregard as to their truth or falsity; and (6) Gordona Duca and Sitton Defendants committed fraud by conspiring to have Cohen make misrepresentations to induce Huffman to enter the Exchange Agreement.[10]  On December 14, 2007, Defendants removed the case to this Court, and the Court subsequently denied Huffman's motion to remand.

Cohen filed a motion for summary judgment, arguing: (1) all of Huffman's claims against Cohen are barred by the statute of limitations; and (2) all of Huffman's claims against Cohen fail as a matter of law.  Sitton Defendants, represented by the same counsel as Cohen, filed a motion for summary judgment, arguing that: (1) Huffman's fraud claim is barred by the statute of limitations; and (2) Huffman's fraud claim against the Sitton Defendants fails as a matter of law.  Gordona Duca, represented by separate counsel, filed a motion for summary judgment, arguing:  (1) all of Huffman's claims against Gordona Duca are barred by the statute of limitations; (2) all of Huffman's claims against Gordona Duca fail as a matter of law; (3) Gordona Duca may not be held vicariously

---

[10]   Huffman also alleges in his Petition that all Defendants committed fraud by causing the Exchange Agreement to be presented to Huffman without adequately disclosing that such agreement "reduced" Cohen and Gordona Duca's duties to Huffman.  However, this theory of fraud was not briefed and appears to have been abandoned.  Regardless, the Court finds this theory of fraud to be without evidentiary support.

liable for negligence or fraud committed by Cohen; and (4) all of Huffman's claims against Gordona Duca are barred by "disclaimers" in the relevant agreements.[11]

## II.      Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.*; *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) (stating that a court "must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues"). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986). "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons*, 206 F.3d at 1026 (quoting *Luckett v. Bethlehem Steel*, 618 F.2d 1373, 1377 (10th Cir.1980)).

## III.     Statutes of Limitations

Because this is a diversity action, the Court applies Oklahoma law in determining whether Huffman's claims are barred by the applicable statutes of limitations. *Burnham v. Humphrey*

---

[11]     CBG filed its Answer on March 17, 2009, well after the discovery and dispositive motion deadlines. (*See* Doc. 77.) CBG has not moved for summary judgment.

*Hospitality Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005) ("A federal court sitting in diversity applies state law for statute of limitations purposes.").  Under Oklahoma law, a two-year statute of limitations applies to Huffman's claims for negligence and fraud, *see* Okla. Stat. tit. 12, § 95(A)(3); a three-year statute of limitations applies to Huffman's claims for breach of statutory duty, breach of fiduciary duty, and breach of oral contract, *see id.* § 95(A)(2); and a five-year statute of limitations applies to Huffman's claim for breach of written contract, *see id.* § 95(A)(1).[12]

"Typically, a cause of action arises and the statute of limitations begins to run on that cause of action when harm occurs to the plaintiff whether the plaintiff knew of the injury or not." *Weathers v. Fulgenzi*, 884 P.2d 538, 540 (Okla. 1994).  In this case, Huffman's injuries occurred on or around September 23, 2002, the date of the Exchange Agreement closing, when Huffman deeded the Sapulpa Tract to Sitton Properties in exchange for cash and properties that he alleges were not of equal worth.  This suit was filed June 20, 2007, approximately four years and eight months following the date of injury.  Ordinarily, Huffman's claims for negligence, fraud, breach of statutory duty, breach of fiduciary duty, and breach of oral contract would be time-barred.  However, Huffman argues for application of the "discovery rule," which "allows the limitations period in certain tort cases to be tolled unless until the injured party knows, or in the exercise of reasonable diligence, should have known of the injury."  *Digital Design Group, Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 839 (Okla. 2001).  The discovery rule tolls the statute of limitations "until such time as a reasonable person under the circumstances of the case would have discovered the injury and

---

[12]     Cohen argues that "[i]t is unclear what contract Huffman is claiming Cohen breached." (Cohen's Mot. for Summ. J. 14.)  The Court finds that Huffman asserts two types of breaches against Cohen and Gordona Duca:  (1) breach of the 4/8/02 Listing Agreement, *see* Pet. ¶ 23; and (2) breach of some oral contract, *see* Resp. to Cohen's Mot. for Summ. J. 15.

resulting cause of action." *Weathers*, 884 P.2d at 541.  The Oklahoma Supreme Court has explained limitations on the discovery rule:

> Properly limited, a discovery rule should encompass the precept that acquisition of sufficient information which, if pursued, would lead to the true condition of things will be held as sufficient knowledge to start the running of the statute of limitations. This rule obtains because a reasonably prudent person is required to pursue his claim with diligence.  For the purposes of the statute of limitations, *if the means of knowledge exist and the circumstances are such as to put a reasonable person upon inquiry*, it will be held that there was knowledge of what could have been readily ascertained by such inquiry and the limitation on the general rule often expressed in the statute is that plaintiff cannot successfully set up a bar to the running of the statute if his failure to discover *is attributable to his own negligence.*

*Id.* (quotations and alterations omitted) (emphasis added).  Nonetheless, "the limitations issue must be submitted to the jury when the facts about the injury's discovery are disputed."  *Digital Design Group*, 24 P.3d at 842.

The Court finds that the question of when Huffman, in the exercise of reasonable diligence, should have known of his injury is one that must be submitted to the jury.[13]  First, the Court finds that there are questions of disputed fact relevant to this inquiry, including but not limited to (1) the true nature of the relationship between Huffman and Cohen; (2) the precise nature of implications, inferences, recommendations, and representations made by Cohen to Huffman regarding the Exchange Agreement; (3) the precise role played by Burgess in examining the Exchange Agreement; and (4) the intended purpose and audience of the Burgess Review.  Resolution of these disputed questions will necessarily impact whether Huffman's decisions – (1) not to request an appraisal or otherwise investigate the Tulsa Tract and Grove Tract prior to closing, and (2) not to request an

---

[13]     Defendants do not contend that Huffman had actual knowledge of his alleged injury within the statutes of limitations periods.  Instead, Defendants argue that, had Huffman exercised reasonable diligence by inspecting the properties, he would have discovered his alleged injury within the statutes of limitations periods.

appraisal or otherwise investigate the Tulsa Tract and Grove Tract during the period that such properties did not sell – were reasonable under the circumstances.  A jury could determine, based on the jury's resolutions of various disputed facts, that a reasonable person in Huffman's circumstances would have discovered his injury by the closing date or some other date that would render his claims untimely.  Conversely, a jury could determine, based on its resolution of disputed facts, that a reasonable person in Huffman's circumstances would not have discovered his injury by the closing date or any other date that would render his claims untimely.  *See Smith v. Baptist Found. of Okla.*, 50 P.3d 1132, 1143 (Okla. 2002) (finding that there were questions of fact concerning when the plaintiff "may have had notice of facts sufficient to advise him that he had been harmed by his trustee's business transactions").[14]

Accordingly, the Court concludes that a jury must determine when Huffman, in the exercise of reasonable diligence, knew or should have known of his alleged injuries arising from the above-described claims. This date will determine when the statute of limitations began to run and whether Huffman's claims for breach of statutory duty, negligence, and fraud fall within or outside the relevant statutes of limitations.  Huffman's claim for breach of the 4/8/02 Listing Agreement is timely because it was filed within five years from the date of injury.

## IV.    Breach of Contract

As explained *supra* note 12, Huffman asserts two types of breaches against Cohen and Gordona Duca:  (1) breach of the 4/8/02 Listing Agreement, and (2) breach of an oral contract.

---

[14]    Even assuming there are no disputed facts, this is a case in which a jury could reach different ultimate inferences regarding when Huffman should have, in the exercise of due diligence, discovered his injury.  *See Digital Design Group*, 24 P.3d at 842 (finding that reasonable jurors may have reached different inferences from undisputed facts regarding whether discovery rule tolled the statute of limitations).

Gordona Duca and Cohen are both parties to the 4/8/02 Listing Agreement; therefore, both Gordona

Duca and Cohen may be held liable for any breach of such agreement.[15]

    A.    <u>4/8/02 Listing Agreement</u>

The 4/8/02 Listing Agreement was the agreement in place at the time Cohen presented

Huffman with the proposal leading to the Exchange Agreement.  In relevant part, this agreement

provides:

> 8.  REALTOR shall provide Transaction Broker services to Seller and as provided under the Broker Relationship Act,  REALTOR's duties under that relationship are:
>
>     1.    To perform the terms of this written brokerage agreement.
>     2.    *To treat all parties with honesty.*
>     3.    To comply with all requirements of the Oklahoma Real Estate License Code and all applicable statutes and rules.
>     4.    *To exercise reasonable skill and care* including:
>         a)    Timely presentation of all written offers and counteroffers.
>         b)    *Keeping Seller fully informed* regarding the transaction.
>         c)    Timely accounting for all money and property received by the Broker.
>         d)    Unless required by law, the Broker shall not without the express permission of the respective party, disclose the following confidential information to the other party:
>         - That a party is willing to pay more or accept less than what is being offered.
>         - That a party is willing to agree to financing terms that are different than those offered.
>         - The motivation of either party in selling or purchasing of the Property.
>         However, *the Broker must disclose pertinent facts relating to the Property, which have not been disclosed by the Seller, or are otherwise known by the Broker.*

---

[15]    Gordona Duca does not appear to dispute that it can be held liable for breach of contract and breach of statutory duty.  Nevertheless, the Court would reject any such argument because Gordona Duca is a party to the 4/8/02 Listing Agreement, is defined as the "REALTOR"/ "transaction broker" in the 4/8/02 Listing Agreement, and is the party entitled to receive the commission pursuant to the 4/8/02 Listing Agreement.

(Ex. D to Cohen's Mot. for Summ. J (emphasis added).)[16] Cohen contends that there is a "complete lack of evidence that Cohen breached his duty as a transaction broker."  (Cohen's Mot. for Summ. J. 24.)[17]

Based on the record, the Court finds questions of disputed fact as to Plaintiff's claim for breach of the 4/8/02 Listing Agreement.  Huffman's evidence, viewed in its most favorable light, establishes that: (1) the Tulsa Tract was purchased by Sitton approximately eight months prior to the Exchange Agreement for $175,000, which is $325,000 less than its agreed value in the Exchange Agreement; (2) Sitton purchased the Grove Tract approximately two years prior to the Exchange Agreement for $109,000, which is $141,000 less than its agreed value in the Exchange Agreement; (3) immediately following the Exchange Agreement, Cohen listed the Sapulpa Tract for Sitton at the price of $1,100,000.00, which was $250,000 more than the agreed value of the Sapulpa Tract set forth in the Exchange Agreement; (4) the Exchange Agreement, combined with Cohen's subsequent listing of the Sapulpa Tract for Sitton, allowed Cohen the opportunity to earn a double commission on the Sapulpa Tract; and (5) Cohen told Huffman that the sale prices of the Tulsa Tract and Grove Tract would cover any second commissions.

---

[16]    Paragraph 9 of the 4/8/02 Listing Agreement provides that "REALTOR shall use [his] best efforts to effect a sale of the Property during the term of this Agreement, in accordance with the Code of Ethics of the National Association of Realtors."  (*Id.*)  However, Huffman has not set forth any relevant portions of the "Code of Ethics" that may have been violated, and paragraph 9 is not at issue.

[17]    Gordona Duca did not make any arguments related to the elements of Huffman's breach of contract claim but did argue, in relation to Huffman's breach of statutory duty claim, that "[t]here are no disputed facts tending to establish that Cohen did not perform his duties as a transaction broker."  (Gordona Duca's Mot. for Summ. J. 16.)

These facts and circumstances, taken together, could convince a finder of fact that Cohen suspected, knew, had reason to know, or in the exercise of reasonable care should have discovered that the Tulsa Tract and Grove Tract were not worth the values set forth in the Exchange Agreement but failed to disclose this fact or suspicion to Huffman.  Such facts could lead to a conclusion that Cohen: (1) failed to treat Huffman "with honesty" by failing to give Huffman his honest opinion and recommendation as to the value of the Tulsa Tract and Grove Tract, (2) failed to exercise "reasonable care and skill" by failing to investigate the values or recommend that Huffman investigate the values, (3) failed to keep Huffman "fully informed" regarding the Exchange Agreement by failing to inform him of his belief that the properties were overvalued; and/or (4) failed to disclose pertinent facts – *i.e.*, the known or suspected true values –  of the Tulsa Tract and Grove Tract.  Further, a jury could conclude that Cohen was motivated to do so because Sitton had already agreed to re-list the Sapulpa Tract with Cohen, thereby entitling Cohen to a potential double commission on the sale of the Sapulpa Tract.  Huffman has presented circumstantial evidence that could convince a trier of fact that Gordona Duca/Cohen violated one or more of the express contractual duties in the 4/8/02 Listing Agreement.

B.    Oral Agreement

Huffman's argument as to any "oral agreement" reached between Huffman and Cohen is less than clear.  The Petition does not mention any oral agreement, and Huffman's brief does not clarify what "oral agreement" he reached with Cohen.  Huffman does argue that Cohen's *actions* indicated that Cohen had undertaken to perform a duty in addition to those set forth in the listing agreements – namely, the duty to serve as Huffman's advocate and to function as a "single-party broker" rather than a "transaction broker."  However, Huffman has not identified any evidence that Cohen and

17

Huffman reached a verbal agreement as to these alleged additional duties; instead, Huffman's argument is based solely on Cohen's actions and Huffman's subjective beliefs.  The Court finds no record evidence as to any oral agreement, and this theory of breach of contract will not be submitted to the jury.

## V.     Breach of Statutory Duty

Huffman contends that Gordona Duca/Cohen breached the statutory duties of a transaction broker, which is the designation provided in the 4/8/02 Listing Agreement and the Exchange Agreement.  Huffman further contends that Gordona Duca/Cohen should, based on Cohen's actions, be held to the higher statutory duties placed on single-party brokers, regardless of the labels used in the relevant agreements.

### A.     Transaction Broker

There is no dispute that Gordona Duca and Cohen, as the defined "REALTORS" in the 4/8/02 Listing Agreement and the Exchange Agreement, were bound to comply with the statutory duties imposed upon transaction brokers.  At relevant times and to date, the Oklahoma Real Estate License Code ("ORELC") defines a "transaction broker" as a "broker who provides services by assisting a party in a transaction without being an advocate for the benefit of that party."  Okla. Stat. tit. 59, § 858-351(5) (2000), *amended by* Okla. Stat. tit. 59, § 858-351 (2005) (amending only definition of "transaction" in § 858-351(4));[18] *see also* Patricia A. Wilson, *Nonagent Brokerage:*

---

[18]     Because there is no indication that the 2005 revisions to ORELC were intended to have retroactive application, the Court must apply the statute in place at the time of the alleged wrongful actions. *See Shelter Am. Corp. v. Ray*, 800 P.2d 743, 746 (Okla. Civ. App. 1990) ("Generally, in the absence of legislative intent expressly declared or implied, statutes are presumed to operate prospectively only, unless they are procedural or remedial, without affecting substantive rights.").

*Real Estate Agents Missing in Action*, 52 Okla. L. Rev. 85, 90 (1999) [hereinafter *Nonagent*

*Brokerage*] (explaining that "transaction broker" is another term for a "nonagent broker" and that

"the idea is that [the nonagent broker] serves as a facilitator to assist the parties in closing the

transaction without being an agent, fiduciary, or advocate for the interest of any party to the

transaction").[19]  At relevant times, a transaction broker owed the following statutory duties:

> A transaction broker shall have the following duties and responsibilities:
> 1. To perform the terms of the written brokerage agreement, if applicable;
> 2. To treat all parties with honesty;
> 3. To comply with all requirements of the Oklahoma Real Estate License Code and all applicable statutes and rules; and
> 4. To exercise reasonable skill and care including:
> a. timely presentation of all written offers and counteroffers,
> b. keeping the party for whom the transaction broker is providing services fully informed regarding the transaction,[20]
> c. timely accounting for all money and property received by the broker,
> d. keeping confidential information received from a party confidential as required by Section 7 of this act, and
> e. disclosing information pertaining to the property as required by the Residential Property Condition Disclosure Act.

Okla. Stat. tit. 59, § 858-353 (2000), *amended by* Okla. Stat. tit. 59, § 858-353 (2005) (footnote

added); *see also Nonagent Brokerage*, at 98 (advocating that state legislatures "permitting a choice

other than singe agency" should set forth "precisely what the consumer receives as services from

the nonagent broker and the standard of care owed to the parties").

---

[19]     This article was published before Oklahoma's adoption of "transaction broker" and "single-party broker" statutes and therefore does not specifically discuss Oklahoma's statutory scheme.

[20]     The duty to keep a party for whom the transaction broker is providing services "fully informed" is not in the current version of the statute.  *See* Okla. Stat. tit 59, § 858-353 (2005).

The statutory duties are nearly identical to the duties set forth in the 4/8/02 Listing Agreement.  For the same reasons explained *supra* Part IV.A, Huffman has created a genuine issue of material fact as to whether Gordona Duca/Cohen breached these statutory duties in dealings with Huffman related to the Exchange Agreement.

      B.    <u>Single-Party Broker</u>

At relevant times and to date, ORELC defines a single-party broker as "a broker who has entered into a written brokerage agreement with a party in a transaction to provide services for the benefit of that party."  Okla. Stat. tit. 59, § 858-351(3) (2000), *amended by* Okla. Stat. tit. 59, § 858-351 (2005) (amending only definition of "transaction" in § 858-351(4)); *see also Nonagent Brokerage*, at 87 (explaining that in "single or exclusive agency" relationships, the broker "represents only one party to the transaction as either the seller's agent or the buyer's agent").  In addition to all duties imposed upon a transaction broker, a single-party broker has two additional statutory duties relevant to this case: (1) "performing all brokerage activities for the benefit of the party for whom the single-party broker is performing services unless prohibited by law;" and (2) "obeying the specific directions of the party for whom the single-party broker is performing services that are not contrary to applicable statutes and rules or contrary to the terms of a contract between the parties to the transaction."  Okla. Stat. tit. 59, § 858-354(4)(e),(g) (2000), *amended by* Okla. Stat. tit. 59, § 858-354 (2005).

Huffman contends that, based on Cohen's actions leading to and during the Exchange Agreement, there exists a question of fact as to whether Cohen functioned as a "transaction broker" or whether he actually functioned as a "single-party broker."  Huffman argues that a jury must determine the true nature of Huffman and Cohen's relationship and that the contract label is not

controlling.  First, the Court must determine if the jury may consider evidence regarding the "true nature" of Huffman and Cohen's relationship despite the contractual label.  If so, the Court must determine if Huffman has presented sufficient evidence to create a question of fact.

Under Oklahoma law, a contractual label is not controlling when the issue presented is whether one individual functions as an agent for another.  *See, e.g., Enterprise Mgmt. Consultants v. State of Okla. ex rel. Okla. Tax Comm'n*, 768 P.2d 359, 362 n.12 (Okla. 1988) (holding that plaintiff corporation was not an agent of an Indian tribe in the operation of bingo games and concession stands despite contractual labels of corporation as "agent" and tribe as "principal") (stating general rule that "[t]he labels used in the contract do not alone determine whether parties litigant stand vis a vis one another in a principal-agent relationship" and that "contractual language must be considered in conjunction with the parties' actual conduct"); *Hinson v. Cameron*, 742 P.2d 549, 558 n.32 (Okla. 1987) ("Whether parties litigant stand vis-a-vis one another in a principal/agent, employer/employee relation or as one independent contractor vis-a-vis another depends on their *status* which is *found from surrounding facts* rather than solely from contract. In case of a discrepancy between facts and contract, *facts* control over the *contrary provisions in the parties' agreement*.").

The principles espoused above have not been applied in the context of determining whether a contractual label used to identify the role of a real estate broker, as such roles are defined under ORELC, is controlling.  However, the dispute regarding single-party broker/transaction broker status turns on whether Cohen served as Huffman's agent/advocate or merely served as a facilitator of the transaction.  Thus, the facts presented are similar to the agent/principal determinations in the above Oklahoma cases, and the Court believes the Oklahoma Supreme Court would extend the holdings

of such cases to the issue presented.  Further, as a matter of policy, under the alleged circumstances presented here, factual considerations are appropriate in determining the role that a broker plays in order to avoid fundamental unfairness to the party employing the broker.  Specifically, in a situation where (1) neither the contract nor the broker explains the differences between a transaction broker and single-party broker under Oklahoma law; (2) neither the contract nor the broker explains that the broker will not serve as the party's agent or perform any advocacy duties; and (3) the broker then proceeds to actually perform typical advocacy/agency functions on behalf of the party, the party employing the broker may reasonably rely on the broker to function as his agent and advocate.  In these circumstances, the Court holds that a label used in an Oklahoma real estate brokerage contract is not controlling, and a jury should be allowed to consider all facts and circumstances to determine whether the broker played the role of a single-party broker or a transaction broker, as those terms are defined under Oklahoma law.

The Court further finds that, in this case, Huffman's evidence is sufficient to create a question of fact.  Huffman testified that he *subjectively believed* that he hired Cohen to serve as his advocate, to negotiate on his behalf as his agent, and to perform brokerage services for his benefit. This, standing alone, would likely not be sufficient.  *Cf. Stearns v. McGuire*, No. 04-1459, 2005 WL 3036538, at *5 (10th Cir. Nov. 14, 2005) (applying Colorado law) (rejecting argument that realtor should be estopped from denying his status as a transaction broker based solely on client's general declaration that he believed the realtor was acting as his agent).  However, Huffman has also presented evidence regarding *Cohen's actions* throughout their relationship that could lead a jury to conclude that Cohen functioned as a single-party broker.  Specifically, there is evidence that Cohen did not merely "facilitate" the Exchange Agreement or bring the parties together so they

22

could then negotiate the deal between themselves. *See Nonagent Brokerage*, at 99 ("The idea behind nonagent brokers is to provide an option whereby the broker can facilitate the transaction and complete in-house sales without the risk of exposure for breaching the duties owed pursuant to agency law."). There is evidence that Cohen had all communications with Sitton and/or Sitton's agents regarding the Exchange Agreement and that Cohen negotiated the terms of the Exchange Agreement on behalf of Huffman, including sending a letter stating that Huffman was agreeable to an exchange if Sitton had property with a "proven value" of $200,000. Huffman testified that Cohen advised him of what form the transaction should take – an exchange agreement as opposed to a cash sale. In addition, Huffman testified that Cohen recommended Riddle, the attorney who ultimately drafted the Exchange Agreement, that Cohen had all relevant communications with Riddle, and that Cohen discouraged Huffman from using Burgess, Huffman's personal attorney, to draft the Exchange Agreement. These facts may convince a jury that Cohen's role was actually that of an agent/single-party broker and not that of a facilitator/transaction broker, as those terms are defined by Oklahoma statutes.[21]

As explained above, the Court finds a question of fact as to whether Cohen breached the statutory duties owed by a transaction broker. Necessarily, the Court finds a question of fact as to

---

[21]    On January 29, 2009, Huffman filed a Petition in Tulsa County District Court against Riddle, asserting claims for legal negligence and breach of fiduciary duty. (*See* Ex. 1 to Gordona Duca's Reply in Support of Summ. J.) Therein, Huffman alleges that "[a]lthough Riddle knew that Cohen claimed to be acting as a transactional broker, Riddle continued to deal with Cohen rather than his client Huffman knowing that Cohen was no longer an agent or fiduciary for Huffman." (*Id.* ¶ 26.) Contrary to Gordona Duca's argument, the Court does not view the Petition as an admission by Huffman that Cohen acted as a transaction broker. A full reading of the Petition reveals that Huffman alleges that he hired Cohen to perform the services of a single-party broker. (*See id.* ¶ 8.)

whether Cohen breached the statutory duties owed by a single-party broker, which include the additional duty of performing brokerage activities for the "benefit" of Huffman.

## VI.     Breach of Fiduciary Duty

By specifying the statutory duties owed by transaction brokers and single-party brokers, the Oklahoma Legislature expressly abrogated all common-law fiduciary duties owed to a party employing the broker.  Okla. Stat. tit. 59, § 858-360 ("§ 858-360") (2000) ("The duties and responsibilities of a broker specified in [§§ 858-351-858-363 of] this act shall replace and abrogate the fiduciary or other duties of a broker to a party based on common law principles of agency."). Therefore, Huffman's claim for breach of fiduciary duty fails as a matter of law.[22]

## VII.    Negligence

"It is fundamental that three elements must be shown in order to establish actionable negligence: (1) existence of a duty on the part of the defendant to protect plaintiff from injury; (2) defendant's breach of the duty; and (3) injury to plaintiff proximately resulting therefrom."  *Scott v. Archon Group, L.P.*, 191 P.3d 1207, 1211 (Okla. 2008).

### A.     Cohen

The existence of a duty of care is a question of law to be decided by the Court.  *Delbrel v. Doenges Bros. Ford, Inc.*, 913 P.2d 1318, 1320 (Okla. 1996).  "[W]hether or not a duty exists

---

[22]     Based on its plain language, the Oklahoma statute abrogates fiduciary duties owed from all types of "brokers," including transaction brokers and single-party brokers. This may be unique to Oklahoma's statutory scheme. *See Stearns,* 2005 WL 3036538, at *4 (interpreting Colorado statute providing that a transaction broker "'is not in a fiduciary relationship with either party to a real estate transaction'" and explaining that, in contrast, a seller's "agent" does in fact owe fiduciary duties); *Century Land Dev't v. Weits*, No. 07-14377, 2009 WL 252091, at *2 (S.D. Fla. Feb. 2, 2009) (explaining that, under Florida law, a "single agent" is a broker who represents either the buyer or seller as a fiduciary).

depends on the relationship between the parties and the general risks involved in the common undertaking." *Id.* A court must determine "whether a defendant stands in such a relationship to a plaintiff that the defendant owes an obligation of reasonable conduct for the benefit of the plaintiff." *Id.* at 1320-21. Duty is an "'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.'" *Id.* (quoting *Wofford v. E. State Hosp.*, 795 P.2d 516, 519 (Okla. 1990)). "The most important consideration in establishing duty is foreseeability," and "a legal duty arises when a human endeavor creates a generalized and foreseeable risk of harming others." *Delbrel*, 913 P.2d at 1320. "The focus of the duty element of negligence is on whether the defendant's conduct creates a broader 'zone of risk' that poses a general threat of harm to others." *Id.*

Cohen argues that, unlike a single-party broker, a transaction broker has no duty to advocate for the party for whom he provides services and therefore does not owe any duty to protect such party from injury. More specifically, Gordona Duca argues that it had no duty to "ensure the property the plaintiff wanted to obtain was as represented" and that "[t]here is no reason [a transaction broker] should also act as an appraiser or have that sort of duty imposed upon him." (Gordona Duca's Mot. for Summ. J. 12.)[23]  Assuming a jury finds that Cohen functioned as a transaction broker, the Court concludes that Cohen stood in such a relationship to Huffman that he owed him an obligation of reasonable conduct. The statutory directives in place at relevant times indicate that Cohen had a duty to protect Huffman from certain types of injury – including those that could result from a lack of honesty, a failure to exercise the reasonable skill and care of a realtor,

---

[23]     Neither Cohen nor Gordona Duca argued that § 858-360 precludes Huffman's negligence claim, and the Court does not reach this question.

and a failure to keep Huffman fully informed of the transaction.  *See* Okla. Stat. tit. 59, § 858-353 (2000), *amended by* Okla. Stat. tit. 59, § 858-353 (2005).  Although a single-party broker owes a greater duty of care because he plays the role of an advocate, that does not mean a transaction broker owes no duty of care whatsoever.  By using the words "reasonable skill and care" in relation to a transaction broker's duties, the Oklahoma Legislature indicated that a transaction broker does have some duties to protect his client from harm.  Therefore, the Court finds that a duty of care exists regardless of whether a jury determines that Cohen functioned as a transaction broker or a single-party broker.[24]

The Court further concludes, for similar reasons explained above, that Huffman has created genuine disputes of fact as to whether Cohen breached his duty to protect Huffman from certain types of harm.  A jury could conclude that Huffman failed to exercise reasonable care and skill by, *inter alia*, proposing and/or recommending the exchange, drafting the Letter of Intent, and failing to recommend or suggest that Huffman have the Tulsa Tract and Grove Tract appraised prior to agreeing to the exchange.  Further, even assuming a jury concludes that Cohen did not owe or breach any "advocacy" duties, Cohen still may be in breach of some other, more elemental obligations of reasonable care and skill when presenting a real estate exchange deal to a client.  *See Century Land*

---

[24]     At least one Oklahoma Supreme Court case has recognized the general principle that "[t]he damages to a principal which flow naturally from the negligence of his real estate broker, and which are a direct consequence of his negligence, are recoverable by the principal." *Ellis v. Hollis*, 398 P.2d 832, 834 (Okla.1965) (quotation omitted) (holding, however, that there was no causal relationship between realtor's alleged negligence in preparation of form contract and the realtor's inability to sell a tract of land to a protective purchaser).  Although this case was decided before the creation of a statutory distinction between transaction brokers and single-party brokers, *Ellis* indicates that realtors generally owe some duty of care to their clients.

*Dev't*, 2009 WL 252091, at *4 (finding issue of material fact as to whether realtor serving as "transaction broker" under Florida law breached her duty of care by failing to provide "property valuation information using skill, care and diligence" because she "compared properties not suitable for comparison, improperly relied on valuations of properties provided by [other defendants], and failed to ascertain the value of adjacent properties").

In addition to the arguments advanced by Cohen, Gordona Duca argued that *Rice v. Patterson Realtors*, 857 P.2d 71 (Okla. 1993), precludes Huffman's negligence claim. In *Rice*, a purchaser sued the seller and the seller's broker for "professional negligence," claiming that they "misrepresented the flood history of the property." *Id.* at 73. The court reiterated that a cause of action for professional negligence against a realtor would not stand if: (1) the purchaser signed a waiver, and (2) the information concerning the alleged defects was equally available to the purchaser and the broker. *Id.* at 72; *see also Dawson v. Tindrell*, 733 P.2d 407, 408 (Okla. 1987) (same). The court in *Rice* held that a negligence claim was precluded because the contract for sale contained an explicit waiver related to flood conditions and incorporated all information "necessary for the purchaser to obtain flood data on the property purchased." *Id.* Gordona Duca argues that, similar to the plaintiff in *Rice*, Huffman "had access to the same information as all parties involved in the transaction – including the opportunity to review all documents and personally verify the property they were selling [sic] was what they intended." (Gordona Duca's Mot. for Summ. J. 9.) Gordona Duca further argues that Huffman was advised by Burgess to have the properties independently appraised and still refused to do so.

First, there are factual distinctions that render *Rice* inapplicable. The broker being sued in *Rice* was the defendant's broker. In this case, Huffman's evidence, viewed in its most favorable

light, indicates that Cohen was hired by Huffman, conducted negotiations on behalf of Huffman, conducted dealings with Sitton and Richert regarding the values of the properties, drafted the Letter of Intent setting forth the values of the properties, recommended Riddle, and conducted dealings with Riddle.   Whether Cohen is ultimately determined to be a transaction broker or single-party broker, the relationship between Huffman and Cohen is considerably different than the non-existent relationship between the plaintiff purchaser and the seller's realtor in *Rice*.   Further, a jury could conclude that information regarding the values of the Tulsa Tract and Grove Tract were not, in reality, "equally available" to Huffman and Cohen.   Specifically, if the jury believes that Cohen had information regarding the values that he did not communicate to Huffman or had reason to question the values in the Exchange Agreement, and yet recommended that Huffman enter the Exchange Agreement without suggesting an appraisal or raising any red flag, a jury could conclude that Huffman did not have meaningful "access" to information demonstrating the need for an appraisal. Further, Huffman was in Arizona at all relevant times.   Although Huffman waived his right to inspect the Tulsa Tract and Grove Tract by initialing the 7/21/02 Letter from Cohen, a jury could conclude that he decided not to do so based on Cohen's own negligence or fraud.   In this situation, the Court does not find *Rice* controlling.

Second, the Court finds a disputed fact as to whether the Burgess Review, which includes questions regarding the fair market value of the Tulsa Tract and Grove Tract, should have caused Huffman to conduct an independent appraisal.   The last line of the Burgess Review, which seems to suggest to Cohen that Burgess draft the Exchange Agreement, could support a finding that it was drafted with Cohen as the intended audience.   In addition, Burgess testified that the "questions regarding value in my memorandum . . . were an attempt to verify values already provided to me by

Mr. Cohen."  (Burgess Aff. ¶ 4, Ex. I to Pl.'s Resp. to Cohen's Mot. for Summ. J.)  Therefore, this fact does not support a grant of summary judgment.

      B.    <u>Gordona Duca</u>

Gordona Duca argues that it cannot be held liable for Cohen's negligence for two reasons: (1) all common-law claims asserted against principals, such as Gordona Duca, based on the actions of that principal's sales associates, are abrogated by § 858-360; and (2) Cohen functioned as an independent contractor.  Both arguments are without merit.

      1.    *§ 858-360*

As set forth above, this section provides:  "The duties and responsibilities of a broker specified in . . . this act shall replace and abrogate the fiduciary or other duties of a broker *to a party* based on common law principles of agency."  Okla. Stat. tit. 59, § 858-360 (2000) (emphasis added).  A "party" is defined as "a person who is a seller, buyer, landlord, or tenant or a person who is involved in an option or exchange."  Okla. Stat. tit. 59, § 858-351(2) (2000), *amended by* Okla. Stat. tit. 59, § 858-351 (2005) (amending only definition of "transaction" in § 858-351(4)).  The Court interprets this statute to preclude certain claims, such as breach of fiduciary duty, asserted *by a party* against a broker that he has employed to perform real estate services.  This provision has no application to the question of when a real estate broker such as Gordona Duca can be held liable for the acts of its sales associate.

      2.    *Independent Contractor*

On August 25, 2000, Cohen entered into an agreement with Gordona Duca entitled "Broker-Associate Agreement Independent Contractor," which provides that Gordona Duca and Cohen are "independent contracting parties with respect to all services rendered under this Agreement or in any

resulting transactions." (Ex. 5 to Gordona Duca's Mot. for Summ. J.) However, the Court holds, as a matter of law, that Gordona Duca is not shielded from liability based on Cohen's independent-contractor status. Under Oklahoma law, one exception to the "independent-contractor rule of non-liability" is that "an employer who performs work through an independent contractor is liable for damages to third persons caused by the negligence of the independent contractor where the employer owes a non-delegable contractual or defined legal duty to the injured party." *Bouzidan v. Alfalfa Elec. Cooperative, Inc.*, 16 P.3d 450, 455 (Okla. 2000). "In cases of non-delegable duty, an employer may be held liable for the negligence of an independent contractor although the employer has exercised reasonable care in all endeavors." *Id.* "In effect, 'non-delegable duty' cases become ones of vicarious liability." *Id.* Examples of non-delegable duties include a municipality's statutory responsibility to protect pedestrians from defective sidewalks; an innkeeper's statutory obligation to protect its guests; a railroad's statutory obligation to preserve roadways for the public benefit; and a lessee's contractual obligation to prevent the lessor's rights and property. *Id.* at 455 n.5. Whether a duty is non-delegable must be decided as a matter of law. *Id.* at 456.

Gordona Duca's duties to Huffman were both contractual and statutory. Gordona Duca was a party to the 4/8/02 Listing Agreement, which defines Gordona Duca as a "transaction broker" and sets forth the statutory duties of a transaction broker. These duties could not be delegated exclusively to Cohen because Gordona Duca was itself a party to the 4/8/02 Listing Agreement and was the party entitled to any commission thereunder. In its reply brief, Gordona Duca did not respond to Huffman's non-delegable duty argument, and the Court is therefore without the benefit of argument from Gordona Duca on this issue. The Court finds Huffman's reasoning and argument to be persuasive as to the existence of a non-delegable duty owed by Gordona Duca to Huffman

created by the terms of the 4/8/02 Listing Agreement, the Exchange Agreement, and Oklahoma statutes.  Therefore, Gordona Duca is not shielded from liability based on Cohen's status as an independent contractor.[25]

## VIII.   Fraud

"Fraud is a generic term embracing every means human ingenuity can invent to enable one person to gain an unfair advantage over another, and includes false suggestions as well as suppression of material truth."  *Wright v. Cies*, 648 P.2d 51, 53 (Okla. Civ. App. 1982) (discussing fraud in context of real estate transaction) (citing *Stapleton v. Holt*, 250 P.2d 451 (1952)).  The general elements of fraud are: (1) the defendant made a material representation; (2) the representation was false; (3) the defendant knew it was false or made it recklessly, without regard for its truth; (4) the defendant made it with the intention that Plaintiff act upon it; and (5) injury was suffered by the plaintiff as a result.  *McCain v. Combined Comm's Corp. of Okla., Inc.*, 975 P.2d 865, 867 (Okla. 1998).

### A.   Cohen

Cohen argues that a claim of fraud cannot be predicated on a representation as to value. Cohen relies on *Wyrick v. Campbell*, 170 P. 267 (Okla. 1918), in which the plaintiff exchanged land with the defendant, with no brokers involved.  The plaintiff alleged, *inter alia*, that the defendant falsely represented an eighty-acre tract of land to be worth $2,000, when the value was actually

---

[25]   Even assuming Gordona Duca does not owe a non-delegable duty to Huffman, Gordona Duca would still not be entitled to summary judgment based solely on Cohen's contractual label as an independent contractor.  *See Hinson*, 742 P.2d at 558 n.32 ("Whether parties litigant stand vis-a-vis one another in a principal/agent, employer/employee relation or as one independent contractor vis-a-vis another depends on their *status* which is *found from surrounding facts* rather than solely from contract. In case of a discrepancy between facts and contract, *facts* control over the *contrary provisions in the parties' agreement*.).

$800.  The plaintiff's only evidence of a false statement was the defendant's expression of opinion as to the value of the two tracts and did not include any "extrinsic facts affecting the value, such as character of improvements, number of acres in cultivation, character or quality of the soil, or other facts that materially affect the value of land."  *Id.* at 267.  The Oklahoma Supreme Court quoted the following general rule from a U.S. Supreme Court decision:

> The general rule is that fraud cannot be predicated on representations as to value, for the reason that such representations are generally regarded as mere opinions, or seller's statements, and in law do not constitute fraud. This is true, though they may operate to defeat an action for specific performance. This rule is based on the fact that value is largely a matter of judgment and estimation about which reasonable and honest men may differ. *Where the parties stand on an equal footing, have equal means of knowledge, and there is no relation of trust and confidence existing between them, fraud cannot be predicated on representations of value.* Such representations rarely induce a man to enter into a contract without negligence on his part in not ascertaining from other sources as to whether such representations are true or false. The law does not deny its aid in such cases because it looks upon a want of candor and sincerity with indulgence, but because it will not encourage that indolence and inattention which are no less pernicious to the interest of society, and will not relieve those who suffer damage by reason of their own negligence or folly.

*Id.* at 267-68 (quotation omitted and emphasis added).

Whether determined by the jury to be a transaction broker or single-party broker, Cohen was an experienced commercial realtor who was earning a significant commission from the exchange and was not on "equal footing" with Huffman.  Nor can it be said that there was no special relationship between Huffman and Cohen.  Huffman paid Cohen to provide a professional service, the service contract creates a specific statutory relationship known as a transaction broker, and a transaction broker owes certain duties to his client, including "honesty" and "reasonable skill and care," which are obviously not present between two strangers exchanging land.  In addition, contrary to the plaintiff in *Wyrick*, Huffman's evidence supports an inference that Cohen made a recommendation to enter the Exchange Agreement while showing reckless disregard for whether

32

the values set forth in the Exchange Agreement were reasonably accurate or not.  The facts further support an inference that Cohen had a motive to push the exchange through so that Cohen could then earn a second commission on the Sapulpa Tract when Sitton sold it.  The Court finds the facts wholly distinguishable from *Wyrick*.

Cohen also contends that Huffman cannot satisfy the first element of a fraud claim because Huffman has failed to create a genuine dispute of fact as to whether Cohen made any "material misrepresentations."  Cohen cites the following deposition testimony of Huffman:

> Q:      Did Mr. Cohen ever tell you that he talked to Mr. Sitton and Mr. Sitton told him the value of his properties?
> A:      No.  What went on between him and Mr. Sitton I have no idea.

(Huffman Dep. at 207:8-12.)  Cohen also cites the following testimony of himself:

> Q:      And did you tell him that you thought it was probably worth $200,000?
> A:      I didn't make any opinions to [Huffman] on values at all.  I don't recall making any values to Ron.  It wouldn't have been my job.

(Cohen Dep. at 161:3-7.)

This deposition testimony does not entitle Cohen to summary judgment for several reasons.  First, Huffman's testimony quoted above is not conclusive that Cohen never made representations to Huffman as to value.  Second, Cohen's testimony that he never made any representations as to value to Huffman is contradicted by paragraphs 26 and 35 of Huffman's affidavit, which allege that Cohen did make representations regarding the values of the Tulsa Tract and Grove Tract.  (Huff. Aff., Ex. B to Pl.'s Resp. to Cohen's Mot. for Summ. J.)  Third, paragraphs 24 and 25 of Huffman's affidavit allege that Cohen "recommended" that Huffman enter into the Exchange Agreement.

(*Id.*)[26]  A jury could conclude that Cohen's "recommendation" amounted to a "misrepresentation," assuming Cohen knew the values were overstated or showed reckless disregard as to whether the values were overstated.  Third, the preliminary negotiations leading to the Exchange Agreement could support a finding that Cohen – by presenting and recommending the exchange of property and drafting the Letter of Intent – was indeed making representations to Huffman as to value.  For example, the 6/10/02 Letter from Cohen to Sitton states that "Mr. Sitton will offer an additional real estate which has a proven value of $200,000.00 or more to make up the difference in the sale of the Sapulpa property."  By using the words "proven value" in this letter, Cohen implies that there will be discussions between Cohen and Sitton, and perhaps even offers of proof by Sitton, as to the value of certain property.  If Sitton did not demonstrate that the relevant land had a "proven value" of $200,000, or if Cohen knew or had other reason to know this property did not have a "proven value" of $200,000, and Cohen recommended that Huffman enter the Exchange Agreement anyway, a jury could conclude that this amounted to a material misrepresentation.  In sum, because the entire Exchange Agreement was premised on the values of the exchanged property, Cohen requested assurances from Sitton regarding the values of the property, and Huffman inquired of Cohen as to the resale values of the property, a jury could reasonably conclude that Cohen made misrepresentations to Huffman.

In addition to challenging the first element, Gordona Duca challenged Huffman's ability to satisfy the causation element, contending that Huffman "never viewed the [Tulsa Tract and Grove

---

[26]     Defendant Gordona Duca's Objection and Motion to Strike Affidavit Attached to Plaintiff's Response to its Pending Motion for Summary Judgment (Doc. 69) is denied.  In his response brief, Huffman effectively distinguished Gordona Duca's cited cases and persuasively explained that the challenged statements in his affidavit were based on his own personal knowledge.

Tract] despite having every opportunity to do so." (Gordona Duca's Mot. for Summ. J. 14.) Gordona Duca argues that any injury Huffman suffered was caused by his own failure to inspect the property. Viewed in its most favorable light, Huffman's evidence is that he relied on Cohen's recommendation, which included explicit and implicit valuation of such properties, and that he did not feel compelled to inspect or appraise the properties because he relied on Cohen. Even if a jury finds that Huffman's failure to inspect the property contributed to his injury, a jury could still conclude that Cohen was the cause of Huffman's injury because Cohen lulled him into inaction. *See* 37 C.J.S. Fraud § 66 (explaining that "[t]he damage must result proximately and not remotely from the fraud in order to render the fraud actionable" but that "a misrepresentation need not be the sole cause of the plaintiff's conduct resulting in his or her injury, as it is enough for the plaintiff to show that, absent the misrepresentation, he or she would not have acted to his or her detriment"). Whether Huffman can satisfy the causation element will depend on the jury's overall assessment of whether Huffman acted reasonably or unreasonably, given all factual circumstances leading to Huffman's decision to enter the Exchange Agreement.

Gordona Duca also relies on the common-law rule of "caveat emptor" to preclude liability for fraud. "Under the common law, as a general rule, the doctrine of caveat emptor applies where a buyer inspects property prior to sale and silence on a seller's part does not constitute fraud where it relates to conditions that buyer, through the exercise of reasonable diligence, could discern upon the inspection." *Rogers v. Meiser*, 68 P.3d 967, 976 (Okla. 2003); *see also Dawson v. Tindell*, 733 P.2d 407, 409 (Okla. 1987) (purchaser sued seller and seller's broker for fraud based on intentional or negligent failure to apprise purchaser of structural damage to home; court affirmed grant of judgment in favor of realtor because purchaser "made two inspections of the house and noticed these

conditions, but nevertheless signed" a release at closing)  ("Fraud as related to purchase of real estate may not be predicated on alleged false statements the truth of which could have been ascertained *with reasonable diligence* by the party asserting their falsity. . . . '[W]here no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness and been misled by overconfidence in the statements of another.'") (emphasis added).

Huffman does not dispute that he could have sought an appraisal of the Tulsa Tract or Grove Tract prior to entering the Exchange Agreement.  Huffman contends, however, that there is a factual question regarding whether "reasonable diligence" – under the circumstances presented – required such an inquiry.  Such circumstances include his belief that Cohen served as his agent, was protecting his interests, and was knowledgeable regarding the fair market values of the relevant properties.  He further contends that Cohen misrepresented or concealed facts that led him to believe that appraisals were not necessary because the land values set forth in the Letter of Intent (drafted by Cohen) and the Exchange Agreement (drafted by Riddle) were accurate.  The Court finds Huffman's evidence sufficient to create a question of fact as to whether he exercised "reasonable diligence" under the circumstances.

B.    Gordona Duca

Gordona Duca argues that it cannot be held liable for Cohen's alleged fraud for two reasons: (1) all common-law claims asserted against real estate agencies as principals are abrogated by § 858-360; and (2) Cohen acted outside the scope of employment.  The Court has already rejected the first argument, *see supra* Part VII.B.1, and the second argument is without merit.

"To hold an employer responsible for the tort of an employee, the tortious act must be committed in the course of the employment and within the scope of the employee's authority." *Baker v. Saint Francis Hosp.*, 126 P.3d 602, 605 (Okla. 2005). "An employee's act is within the scope of employment if it is incident to some service being performed for the employer or arises out of an emotional response to actions being taken for the employer." *Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241, 1245 (Okla. 1993). "In such an instance, an employer can be held liable even if the employee acts beyond the given authority." *Id.* The plaintiff bears the burden of proving that the employee was acting within the scope of his employment. *Id.*

The Court concludes, as a matter of law, that Huffman has shown that any fraud perpetrated by Cohen was within the scope of his employment. Even if not authorized by Gordona Duca, the fraud was "incident" to Cohen's service being performed for Gordona Duca – namely, Cohen's sale/exchange of the Sapulpa Tract. Any intentionally tortious actions related to the Exchange Agreement were clearly for the purpose of furthering Gordona Duca's business because the Exchange Agreement ultimately earned Gordona Duca a commission on $1,000,000. Under these circumstances, Cohen's allegedly fraudulent actions in relation to the Exchange Agreement were "incident to some service being performed for" Gordona Duca, and there are no material facts in dispute. *See Rodebush*, 867 P.2d at 1245.

Although not raised by the parties, Gordona Duca is also liable for Cohen's alleged intentional tort because Cohen acted at all times with Gordona Duca's apparent authority. Liability based on apparent authority is not grounded in a "scope of employment" analysis but is instead grounded in general agency principles. *See* Restatement (Third) of Agency § 7.08 ("A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a

third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission."); *id.* § 7.08 illus.1 (giving example of principal being held liable where sales person made misrepresentation of value).  In this case, Gordona Duca manifested its assent that actions by Cohen would bind Gordona Duca because: (1) Gordona Duca is named as the REALTOR in the 4/8/02 Listing Agreement, and Cohen executed the agreement on its behalf; (2) the Exchange Agreement provides that "Gordona Duca, Inc. and its agent, Lee Cohen, is acting as Transaction Broker for Huffman;" and (3) the Exchange Agreement provides that Huffman shall pay the commission directly to Gordona Duca. Thus, Gordona Duca manifested its assent in writing on two occasions that Cohen serve as its agent for purposes of all transactions related to the Sapulpa Tract, and Huffman reasonably believed that Cohen had apparent authority to act on behalf of Gordona Duca at all relevant times. *See id.* § 3.03 ("A principal may also make a manifestation by placing an agent in a defined position in an organization or by placing an agent in charge of a transaction or situation. Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so."). Accordingly, Gordona Duca may be held liable for Cohen's alleged fraudulent conduct.

C.    Sitton Defendants

The allegation against the Sitton Defendants, Sitton, Sitton Properties, and Richert are that they conspired with Cohen to misrepresent the values of the Grove Tract and Sapulpa Tract in order to accomplish the Exchange Agreement.  The allegations are somewhat similar to those in *Wright v. Cies*, 648 P.2d 51 (Okla. Civ. App. 1982), in which sellers sued their listing realtor, two of his

38

agents, and buyers for fraudulent representations as to the value of the real estate. The realtor in that case recommended to the sellers that their house be offered for sale for $83,000, and the house sold for $80,000. The purchasers, who were friends and neighbors of the sellers' realtor and were also realtors themselves, later sold the home for $103,000. "The gist of [the sellers'] action [was] that the defendants acted in concert to defraud the absent [sellers] using the fiduciary relationship that existed between the [sellers and the realtor] as the exploitative vehicle." *Id.* at 52. The court reversed the trial court's grant of summary judgment to the defendants, finding that the realtors' "credibility hangs in the balance" and that there existed a "devastating fact" that the purchasers represented to the bank a few days following sale that the property was worth at least $92,500. *Id.* In addition, the realtor received a commission on the first sale and a larger one on the second sale. *Id.* at 53.

Although the facts do not precisely align with those presented in *Wright*, Huffman's version of events, if believed by a jury, is close enough to the facts presented in *Wright* to preclude a grant of summary judgment in favor of the Sitton Defendants. Huffman has presented sufficient evidence that a reasonable jury could conclude that Sitton, Richert, and Cohen acted in concert to induce Huffman to enter the Exchange Agreement, knowing or having reason to know that the values set forth in the Exchange Agreement were substantially overstated. Specifically, there is evidence that Sitton purchased the properties shortly before the Exchange Agreement was executed for significantly lower prices, that Richert was to earn a commission from the exchange, and that Cohen had or developed a relationship with Sitton such that Sitton listed the Sapulpa Tract with him following the closing of the Exchange Agreement. Although the evidence is entirely circumstantial, and a jury may believe that neither Sitton nor Richert conspired with Cohen to deceive Huffman in

39

any way, this is for a jury to decide.  Like the court in *Wright*, this Court concludes that "fact finders will have to determine whether the defendants jointly or severally took unfair advantage" of Huffman "using the trust confided" in Cohen "as the medium to achieve the unlawful objective, or, to put it differently, whether each defendant knowingly became a participant in a scheme to defraud" Huffman.  *See Wright*, 648 P.2d at 54.[27]

## IX.  Waiver/Disclaimer

Gordona Duca raises one final argument in support of its motion for summary judgment – that all claims are precluded by language contained in (1) the 4/8/02 Listing Agreement, and (2) the Exchange Agreement.  The alleged waiver of liability in the 4/8/02 Listing Agreement provides: "All of the information provided herewith, or which may be provided to REALTOR, shall be true and Seller agrees to hold REALTOR . . . harmless from any cost, expense, or damage *due to any information which is withheld by Seller from REALTOR, or which is incorrect.*"  (4/8/02 Listing Agreement, ¶ 6 (emphasis added).)  This provision relates to Huffman's agreement to hold Gordona Duca/Cohen harmless if *Huffman* withholds or misrepresents information regarding the Sapulpa Tract and has no application to the facts presented.

The alleged disclaimer in the Exchange Agreement also does not preclude Huffman's claims. It provides:

> DISCLAIMER: It is expressly understood by the Parties that the Listing Realtor or their Agents and the Selling Realtor or their Agents or the Transactional Realtor and their Agents (collectively referred to as the "Brokers") *do not warrant the present*

---

[27]     The *Wyrick* rule that misrepresentations as to value are not actionable fraud when parties stand on equal footing has more applicability to Sitton because he was not in any special relationship with Huffman.  However, Huffman's theory of fraud is similar to the plaintiffs' theory in *Wright*, a more recent decision presenting similar facts, and the Court finds summary judgment to be inappropriate as to Sitton and Richert.

*or the future value,* the size by square footage, condition, structure or structure systems of any building, nor do they hold themselves out to be experts in quality, design and construction. *The Acquiring Party further agrees to hold the Brokers harmless in the event their expectations regarding these items are not met.* Brokers, however, agree that they will disclose to the Acquiring Party of any defects or problems with the Conveying Party's Exchange Properties that are within their actual knowledge. *Notwithstanding the provisions of this paragraph, the listing agreement or broker's agreement, if any, entered into by a Broker and a Conveying Party, which conflicts with the provisions of this paragraph, shall control with respect to the provisions of this paragraph.*

(Exchange Agreement, ¶ 15.8 (emphasis added) ("Disclaimer").)  Even though the Disclaimer provides that Gordona Duca/Cohen did not "warrant" the values of the Tulsa Tract and Grove Tract, the Disclaimer also provides that the duties set forth in the 4/8/02 Listing Agreement control over the disclaimer.  In other words, if Gordona Duca/Cohen violated any of these duties – which include a duty of honesty, a duty of reasonable care and skill, and a duty to keep Huffman fully informed regarding the transaction – the alleged waiver of liability has no effect.  In this case, all alleged wrongful actions fall outside the scope of the Disclaimer because they are otherwise precluded by the 4/8/02 Listing Agreement and by statute.

## X.   Punitive Damages

For reasons explained *supra* Part V, the Court finds that a jury could conclude that Defendants are "guilty of reckless disregard" for the rights of Huffman, *see* Okla. Stat. tit. 23, § 9.1, and that summary judgment is not warranted.

## XI.   Conclusion

Defendant Lee Cohen's Motion for Summary Judgment (Doc. 47) is: (1) GRANTED as to Huffman's claim for breach of oral agreement and breach of fiduciary duty; and (2) DENIED as to all other claims.  Defendant Gordona Duca, Inc.'s Motion for Summary Judgment (Doc. 50) is: (1) GRANTED as to Huffman's claim for breach of oral agreement and breach of fiduciary duty; and

(2) DENIED as to all other claims.  Defendants Mike Sitton, Sitton Properties, LLC, and William Richert's Motion for Summary Judgment (Doc. 48) is DENIED.  Defendant Gordona Duca's Objection and Motion to Strike Affidavit Attached to Plaintiff's Response to its Pending Motion for Summary Judgment (Doc. 69) is DENIED.  Based on the undisputed facts, the Court holds as a matter of law that Gordona Duca is, either directly or vicariously, liable for any of Huffman's successful claims, including breach of contract, breach of statutory duty, negligence, and fraud.  The Court further holds as a matter of law that Huffman's claims are not barred by any waivers or disclaimers in the relevant agreements.

Defendant Cohen's Motion to Reschedule Trial Date (Doc. 81) is GRANTED.  The parties should be prepared to discuss alternative trial dates at the pretrial conference.

**IT IS SO ORDERED this 29th day of April, 2009.**

**TERENCE KERN**
**United States District Judge**